JULIA SMITH GIBBONS, Circuit Judge,
concurring.
CONCURRING IN PART AND IN THE JUDGMENT
I agree that our precedents compel reversal for the reasons explained in the majority opinion and concur in all of it except the two paragraphs concluding that the Ohio Court of Appeals decision was contrary to clearly established Federal law *625 because it applied an arbitrary and disproportionate evidentiary ruling to exclude the pre-1989 evidence at issue. I elaborate slightly on the analysis that provides for me the most obvious and straightforward basis for resolution of this appeal.[1]
AEDPA’s limited grounds for relief include a state court’s decision on the merits that unreasonably applied clearly established Federal law. 28 U.S.C. § 2254(d). A state court unreasonably applies the law if “there is no possibility fairminded jurists could disagree that the state court’s decision conflicts with [the Supreme] Court’s precedents.” Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011).
Here, no fairminded jurist could disagree that the Ohio Court of Appeals violated the clearly established law set out in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). Under this theory— unlike the theory upon which the majority opinion principally relies — we need not decide whether the state faithfully applied its own precedent, State v. Lott, 97 Ohio St.3d 303, 779 N.E.2d 1011 (2002), in this instance. Instead, we proceed to the heart of the issue and ask simply whether the state court decision involved an unreasonable application of the clearly established law that the Supreme Court announced in Atkins and Hall.
The clearly established mandate of those cases, for present purposes, is twofold. First, states may take different routes but must reach the same end point: ensuring that no intellectually disabled individual is subjected to the state’s death penalty. Atkins, 536 U.S. at 317,122 S.Ct. 2242; Hall, 134 S.Ct. at 2001 (“The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.”). Second, in deciding which individuals are intellectually disabled, states do not operate in a vacuum. Their tests must be tethered to the definition of intellectual disability that the Supreme Court has recognized, a definition that is itself heavily influenced by the medical understanding of that condition. Hall, 134 S.Ct. at 2000 (“The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community’s diagnostic framework. Atkins itself points to the diagnostic criteria employed by psychiatric professionals.”); Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (“[T]he science of psychiatry ... informs but does not control ultimate legal determinations....”).
The Court applied this standard in Hall in holding that Florida’s scheme for assessing intellectual disability was incompatible with Atkins. Florida courts imposed a rigid rule requiring a defendant to demonstrate an IQ of seventy or below as a threshold matter. Id. at 1992. Without such a showing, a defendant would be unable to prove intellectual disability, no matter the other circumstances. See- id. Of the two IQ tests that were admissible in Hall’s trial, neither showed an IQ of seventy or below. Id. The Florida Supreme Court therefore concluded that he was unable to demonstrate intellectual disability, and that the Eighth and Fourteenth Amendments did not bar his execution. Id. Drawing on the medical understanding of intellectual disability set forth in Atkins, the U.S. Supreme Court reversed. Id. at 2001. It emphasized that IQ test scores are mere “approximations of conceptual functioning,” subject to a standard error of measurement. Id. at 2000 (internal quotation marks omitted). As a result, “an individual with an IQ test score ‘between 70 *626 and 75 or lower’ ... may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.” Id. at 2000 (quoting Atkins, 536 U.S. at 309 n. 5, 122 S.Ct. 2242). Florida’s test “eontradict[ed] the [IQ] test’s own design,” by failing to account for the standard error of measurement and eliminating “an essential part of a sentencing court’s inquiry into adaptive functioning.” Id. at 2001. The state law therefore contradicted “the unanimous professional consensus.” Id. at 2000 (internal quotation marks omitted).
No fairminded jurist could disagree that the Ohio Court of Appeals went similarly awry in Williams. The U.S. Supreme Court, adopting the consensus of the medical community, understands intellectual disability as a permanent condition, affecting a defendant not only at the time of the offense, but also at the times of trial and execution. Atkins, 536 U.S. at 319-21, 122 S.Ct. 2242; see also Heller v. Doe, 509 U.S. 312, 323, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (noting, in a different context, that intellectual disability “is a permanent, relatively static condition” (citing S. Brakel et al., The Mentally Disabled and the Law 37 (3d ed.1985))). This is why intellectual disability makes an individual permanently ineligible for execution, unlike an individual deemed incompetent for execution, who may later regain competency and be executed. See, e.g., Singleton v. Norris, 319 F.3d 1018, 1027 (8th Cir.2003) (en banc) (citing Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). The Atkins Court further noted that intellectual disability “ ‘may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system,’ ” Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (quoting Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000)), and discussed the deficiencies in cognitive and adaptive functioning that characterize an intellectually disabled person, id. at 308 n. 4, 309 n. 5, 122 S.Ct. 2242.[2] It is clear from the entire thrust of the Atkins decision — along with the medical literature that it cites in support — that intellectual disability is a permanent condition.
The Ohio Court of Appeals — by contrast — approached the evidence of Williams’s alleged intellectual disability as if it were a transient condition. That court held that pre-1989 evidence of Williams’s subaverage intellectual functioning and deficits in adaptive functioning “only attest his intellectual functioning prior to 1989” and therefore “do not constitute competent evidence from which inferences may be made regarding his present mental capacity.” State v. Williams, No. 2007-T-0105, 2008 WL 2582849, at *6 (Ohio Ct.App. June 27, 2008).[3] Given the enduring nature of intellectual disability, there is no basis for excluding evidence from earlier in Williams’s life. If Williams was intellectually disabled in 1989, he remains intellectually disabled now. By excluding the pre-1989 evidence, the state court severely limited its own ability to make a 'reasoned assessment of Williams’s condition according to the legal and medical standard, that Atkins and Hall plainly require. Andre Williams “may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability.” See Hall, 134 S.Ct. at 2001. That includes the evidence that the state court excluded here.
*627 Regardless of whether the Ohio Court of Appeals followed its own state’s law, no fairminded jurist could disagree that its decision conflicts with the clearly established law enunciated in Atkins and Hall. This provides an alternative basis for relief under AEDPA.
I also touch briefly on my quibble with the portion of the majority opinion in which I do not concur. This third rationale is not necessary and I question whether it is appropriate here. The Ohio Court of Appeals did not explicitly invoke any evidentiary rule when it excluded the pre-1989 evidence. The court stated that that evidence was not “competent” to prove present intellectual deficits. In the context of the opinion, this appears to mean that the pre-Í999 evidence is not relevant to the Atkins/Lott test (other than the “onset before 18” prong).
This evidentiary ruling was not arbitrary or disproportionate. The state court excluded the evidence simply because it misunderstood and misapplied Atkins and Lott. If it had been correct that intellectual disability can fluctuate and that present functioning was a separate fact to be proven, it would have been correct to exclude the pre-1989 evidence as irrelevant. In reality, the court’s erroneous exclusion of the evidence was due to a misapplication of the substantive law (an issue the opinion already analyzes), not an arbitrary or disproportionate evidentiary ruling.

. Discussion of this issue, is found at pp. 619-22 of the majority opinion.

. The Atkins decision and the material it cites refer to (lie condition as "mental retardation.” In modern lexicon, the preferred term is “intellectual disability.” See Hall, 134 S.Ct. at 1990.

. Williams turned 22 in 1989. See Williams, 2008 WL 2582849, at *2.